WILLIAM B. OGDEN, Impleaded with
CHARLES BUTLER,

*v.*

WILLIAM M. LARRABEE, Adm'r.

1. VENDOR AND PURCHASER—*rescission by the former—what constitutes—declaration of forfeiture.* The sale of land to a third person by the vendor, during the existence of a prior contract of sale, will operate as a rescission of such prior contract, and that fact of itself will amount to a declaration of forfeiture thereof.

2. SAME—*recovery of purchase money after rescission.* A vendor can not rescind an executory contract for the sale of land, and afterwards proceed to collect the purchase money.

3. FRAUD *in obtaining a judgment—remedy in chancery.* A court of chancery has power to annul and cancel a judgment at law if it has been obtained by fraud.

4. Where a vendor of land sold the same to another, thereby declaring a forfeiture of the prior contract, and also putting it out of his power to convey according to its terms, and afterwards obtained an allowance against the estate of the purchaser under such prior contract, for the unpaid purchase money, it was held, the procurement of the allowance under such

circumstances was fraudulent in law, and a court of chancery should set aside and cancel the same.

5. TRUSTEE—*what constitutes.* A vendor of land executed a contract in writing, through his attorney in fact, for the conveyance thereof upon the payment of the purchase money at the times and in the manner therein specified. Subsequently, the purchaser, to secure a balance due upon the purchase money, assigned to such attorney in fact certain notes and mortgages, with "full power to settle, compromise or exchange the aforesaid mortgages and notes for other property or demands, taking part of the amount due in lieu of a larger part or the whole as he should think best in his judgment, and to cancel and discharge such mortgages from the record for such consideration as he might think proper," and to pay the proceeds to the vendor in satisfaction of his claim, and the residue to such assignor, the purchaser, or his heirs or assigns : *Held,* the assignee of those notes and mortgages held them and the proceeds of them as a trustee for the assignor, and subject to all the duties and restrictions properly incident to that rela-tion.

6. TRUSTEE *can not buy at his own sale.* Upon foreclosure of one of the mortgages so held by the trustee, in his name as the assignee, it was *held,* that by reason of his relation to the fund, he could not properly become a purchaser in his own right under the decree.

7. The rule that a trustee can not rightfully become a purchaser at his own sale, and hold to his own use, applies as well where the sale is made under a decree of court as when made by himself.

8. SAME—*of pledgor and pledgee.* The broad powers given to the assignee of the notes and mortgages, to "settle, compromise, or otherwise sell, arrange or dispose" of them, did not operate to create the relation of pledgor and pledgee between him and his assignor. But even if that relation had existed, the law would not have conferred upon the pledgee any greater privileges or imposed less liabilities in dealing with the pledge, than in case of a trustee dealing with the trust fund,—so that in either case he could not purchase for his own use, at a sale had by virtue of that relation.

9. SAME—*trustee held to his bid.* Where, upon foreclosure of a mortgage, a trustee of the fund to which the mortgage belonged, through his attorney, bid off the land at the master's sale, in his own name, and attempted to hold it to his own use, it was *held,* upon bill filed by the *cestui que trust* to charge the trustee in respect to the subject matter of the sale, that although the attorney exceeded his authority in bidding for the property more than it was worth, yet the trustee, by subsequently accepting the master's deed, with knowledge of those facts, would be regarded as having ratified the act of his attorney, and be held to his election to take the purchase at his bid.

10. SAME—*where trustee buys at his own sale, by whom chargeable and to what extent.* While the trustee is forbidden to purchase at a sale under a

decree of foreclosure of a mortgage belonging to the trust fund, yet if he does so become the purchaser, the sale is not for that reason void, but merely voidable, at the election of the *cestui que trust.* The sale would still operate to complete the foreclosure as against the mortgagor, but the purchaser would hold the property subject to all the conditions of the trust the same as he held the mortgage itself.

11. Where a trustee of any kind, buys property, directly or indirectly, of which he is the trustee, the *cestui que trust* may, at his option, without reference to the fact whether it was to his interest or not, and without proof that he is damnified, or even inquiring into that question, have the sale set aside, and have the property re-exposed to sale, or he may elect to have the sale affirmed at the bid of the purchaser, or, where the property has been subsequently sold by the trustee to a third party, to have the value of the property or the amount realized from the sale.

12. Where a trustee improperly purchased at his own sales under decrees of foreclosure, the biddings being upon distinct parcels of land, and at different times, and afterwards sold the several parcels, some at less than his bid, and others at a considerable advance, it was *held*, in fixing the rule of accountability of the trustee to the *cestui que trust*, the latter may elect to take the amount bid by the trustee in the one case, and the amount realized by him on his subsequent sale in the other.

13. TRUSTEE—INTEREST—*of annual rests.*—The rule seems to be, that in all cases where the trustee has used the trust fund, and it appears he has realized large gains and profits to himself, and has failed to keep any exact account of the same, or has refused to render an account to the beneficiary, the law will require him, in order that complete justice may be done, to account for the original fund so used, with interest computed with annual rests.

14. VENDOR AND PURCHASER—*forfeiture of contract and purchase money paid.* A contract for the sale of land provided that in case the purchase money should not be promptly paid, the vendor might at his option declare the contract at an end, and in that event, whatever money might have been paid upon the purchase should be absolutely forfeited to the vendor. Several payments were made, and at the request of the vendee, one half the land was conveyed to a third party, the vendee in the original contract receiving the entire purchase money therefor. Subsequently, the original vendor declared the contract forfeited for non-payment of the balance of the purchase money. Afterwards the vendee died, and the vendor obtained an allowance against his estate for the entire unpaid balance due on the whole tract sold, having sold and conveyed the remaining half of the land to other parties. On bill filed by the representatives of the vendee to adjust the equities between the parties, it was *held*, that while the vendor was not entitled to the allowance for all the purchase money remaining unpaid on the whole tract at the time he declared the forfeiture, yet he was entitled to

compensation for the half of the land conveyed on the request of the vendee; and in adjusting the different payments made, which were upon the whole tract, and not upon either half specifically, it was held one half the money paid should be applied on that part of the land conveyed at the instance of the vendee, and the other half to be embraced in the forfeiture.

APPEAL from the Superior Court of Chicago; the Hon. JOHN A. JAMESON, Judge, presiding.

This was a suit in chancery, instituted in the court below by Larrabee, administrator of the estate of James Spence, deceased, against William B. Ogden and Charles Butler, for the purpose of charging Ogden in respect to a certain fund alleged to have been placed in his hands in trust for Spence, during the life time of the latter. The bill also seeks relief against the allowance of a certain claim in favor of Butler against the estate of Spence, for purchase money for land claimed under a contract which had been rescinded by Butler, the vendor, before the allowance was obtained.

The facts are, substantially, as follows:

On the 22d day of July, 1836, James Spence entered into a contract with Charles Butler to purchase from him a part of block 34 in Kinzie's addition to Chicago. The defendant Ogden, signed the contract as attorney in fact for Butler. Spence was to pay for the land the sum of $5,334.47,—$400 cash in hand, $2,434.47 in one year without interest, and the balance, $2,500, in two years, with interest at 10 per cent after the 22d of July, 1837, to be paid annually. The contract pro-. vided that in case default should be made in the payment of the principal or interest for sixty days, all the provisions of the contract should be null and void, at the election of Butler, and all payments before made should be forfeited; and in case of such election, Spence, his heirs or assigns, in possession at the time, were to surrender possession, or hold as tenants under a rent equal to 10 per cent interest upon the whole price of the lot, Butler to have all rights and remedies of a landlord, and Spence to pay all taxes, assessments, etc.

Spence paid the $400 at the date of the contract, and it was indorsed thereon.

On the 5th of October, 1837, Butler, at the request of Spence, conveyed one-half of the land to Mark Skinner; Spence, by agreement, indorsed upon the contract, covenanting to remain liable for the entire payments, as before.

This agreement of Spence was as follows:

"I request that a deed be made for fifty-four and one-half feet deep by one hundred feet, from north side of the within premises, to Mark Skinner, he having paid me for the same, and I still remain holden for the whole amount of this contract, as before, and at my request the deed has been so made."

On the 8th of December, 1837, Spence assigned to Ogden four notes, secured by mortgages upon property near the city of Milwaukee, as collateral security for the payments then due, and thereafter to become due, upon said contract. That assignment was in writing, and the material parts of it are as follows:

"I, James Spence, by these presents, hereby assign, transfer, and set over to the said William B. Ogden, party of the second part, his heirs, executors, administrators or assigns, the following notes and mortgages, to-wit: Charles A. Spring's note to the party of the first part (Spence) for $2561.50, dated 1st of September, A. D. 1836, and payable eighteen months from the date thereof, and said Charles A. Spring's mortgage of same date upon the undivided one-fourth part of lots numbered 7 and 8, in section numbered 21, in township numbered 7, north, in range number 22, E., situate in the town of Milwaukee, in the Territory of Wisconsin, executed to secure the payment of the aforesaid note.

"Also, Nathaniel Norton's two notes, dated 14th of September, A. D. 1836, as aforesaid, the one for $830.33, payable twelve months after the date thereof, to the said party of the first part (Spence), and the other for $853.77 payable to the same, eighteen months after date thereof,.and said Nathaniel Norton's mortgage of the same date to the said James Spence, party of the first part, hereto, on the one-fourth part of the

394          OGDEN, ETC., *v.* LARRABEE, ADM'R.          [Sept. T.,

Statement of the case.

same premises, as described in Charles A. Spring's mortgage, aforesaid, to secure the payment of said notes.

" Also Seneca Stewart's two notes of same date, payable at the same time, and to the same party, the first for the same amount, that is to say, $830.33, and the second for $853.82, and said Seneca Stewart's mortgage of same date, on the one-fourth part of same premises, as before described in said Spring's mortgage, to secure the payment of the said two notes.

" Also, W. L. Pickering's two notes, of same date and amounts, and payable at the same time, and to the same party as said Stewart's notes, and, also, said W. L. Pickering's mortgage, of same date, on the remaining one-fourth part of said premises, to secure the payment of his said notes ; the aforesaid mortgages being duly recorded in the register's office for the county of Milwaukee, aforesaid, on the 4th day of February, A. D. 1837, in Volume A of Mortgages, on pages 181 to 188, inclusive, as, reference being thereto had will more fully appear.

" And I, the said James Spence, do hereby authorize and empower the said William B. Ogden, his executors, administrators, and assigns, in my name or otherwise, and for his or their own proper use and benefit, to take, adopt, pursue and follow all lawful ways and means whatever for the collection, payment and satisfaction of the said notes and mortgages, and upon payment thereof to acknowledge satisfaction of the said mortgages, and cause them to be cancelled of record, and to transact and perform all lawful acts and things in the premises as fully and amply as I, myself, might or could do, were I acting therein on my own behalf. The aforesaid mortgages and notes hereby assigned, as aforesaid, are held by said Ogden, party of the second part, as collateral security for the payment of moneys due from me, James Spence, party of the first part, hereto, to Charles Butler, his heirs, or assigns, by virtue of the contract made by me with the said Charles Butler, through his attorney, W. B. Ogden, on the 22d day of July, A. D. 1836,

for a part of the block numbered 34, in Kinzie's addition to Chicago, specified therein, and any and all moneys received upon any of the aforesaid notes, or from the avails of any sales of the premises included in said mortgages, or any of them, after defraying all costs, charges, commissions, fees and other expenses incurred in the collection of the same, are to be applied by the said W. B. Ogden in payment of the moneys due or to become due from me to the said Charles Butler, his heirs or assigns as aforesaid, and after discharging all liabilities owing or that may be owing by me to the said Charles Butler, his heirs, or assigns, or to the said William B. Ogden, his heirs or assigns, over and above all costs, charges, and fees, and expenses, as above stated, if there shall be any overplus in the hands of said Ogden, the same is to be repaid to me, my heirs or assigns, and I, James Spence, party of the first part, hereby further agree and authorize and empower the said William B. Ogden, his heirs, or assigns, to settle, compromise, or otherwise arrange or dispose of the aforesaid notes and mortgages, for such portion of the amount due thereon, or to take from them such further property or notes, or otherwise, as, in his judgment, shall be the most advisable, giving the same and all powers to him to settle, compromise or receive a part in satisfaction of a larger part, or the whole of said property, that I have, or would have in my own proper person, hereby sanctioning all such acts of said Ogden, his heirs or assigns. "

This assignment was executed by Spence, under his hand and seal, and witnessed by the complainant, W. M. Larrabee.

On the same 8th of December, 1837, Spence assigned to W. B. Ogden, a mortgage made by Edward W. Fisk and W. L. Pickering, to him (the said Spence) bearing date 11th of July, 1836, made to secure the payment of two certain promissory notes, one payable six months from the date thereof, at the Fulton Bank, in the city of New York, for $2,365.36, and the other payable twelve months after the date thereof, at either of the banks in the city of New York, for $2,434.47, together

with the two notes above described, and all moneys and interest due thereon, or to become due, and thereby authorized the said W. B. Ogden, or his attorney, heirs or assigns, to use his name, and all legal measures, to collect the notes, or foreclose the mortgage, and sell the premises therein described, in satisfaction of the money due and to become due on the notes, and to do all things necessary in relation to the said mortgage and notes, for the collection thereof, or otherwise, as fully " as I, myself, could do, and I hereby authorize him, the said Ogden, to prosecute the said Edward W. Fisk and W. L. Pickering, or either of them, for the payment of said note, and all moneys so received of Fisk or Pickering, or realized out of the sale of the premises described in the annexed mortgage, aforesaid, after deducting all costs, charges and expenses incurred thereon, to be applied upon my debt to Charles Butler, for part of block 34, in Kinzie's addition to Chicago, and more particularly described in the said Charles Butler's contract of sale to me of said part of block 34, bearing date 22d of July, 1836. It is further agreed and understood by me, that the said W. B. Ogden, his heirs and assigns, have as full power to settle, compromise or exchange, as aforesaid, the aforesaid mortgage and notes for other property or demands, taking part of the amount due in lieu of a larger part or the whole, as he shall think best, in his judgment, and to cancel and discharge such mortgage from the records, for such consideration as he may think proper, as was vested in me before making this assignment, accounting for such amount, only in the manner before mentioned, as he may receive.

JAMES SPENCE. [SEAL.] "

James Spence died at Chicago, on the 9th of May, 1838, without having made any further payment on his contract with Butler, than above stated, nor had anything been realized by Butler and Ogden upon the notes and mortgages which had been assigned to them as collateral security for Spence's indebtedness on his contract. Shortly after the death of Spence, and in the month of May, 1838, letters of administration upon his

estate were granted to the complainant, W. M. Larrabee, by the proper authorities of Cook county, Illinois.

It appears from the mortgages themselves, and also from the testimony of Scammon and Ogden, that the four mortgages assigned by Spence to Ogden covered an undivided half interest of the mortgagors in the mortgaged premises, and that the other undivided one-half interest had been, by the same parties, mortgaged to one Seth Johnson, which mortgage was due and unpaid. On the 28th of May, 1838, Ogden filed four bills in equity, to foreclose these mortgages, in the United States District Court, at Milwaukee. It appears that Scammon at this time owned the Johnson mortgages, and that Ogden employed him, on their joint account, to procure the foreclosure of all the mortgages in four suits, in order to save expense of separate foreclosures on account of each of the mortgages. Scammon intrusted the business of foreclosing these mortgages to a lawyer at Milwaukee, who obtained decrees for foreclosure of the mortgages, and in the absence of instructions from either Scammon or Ogden, as to the amount which he should bid at the foreclosure sale, bid off the property in the name of Ogden, for $4000, or $1000 for each mortgage, and deeds were executed to Ogden in conformity with those bids and proceedings. It appears that Ogden then held the entire mortgage interest, one-half for the benefit of Scammon, and the other half for account of Spence. In November, 1839, Ogden filed a bill in the District Court of the United States at Milwaukee, to foreclose the Fisk and Pickering mortgage, and a decree was obtained in June, 1840; and on the 28th of September of that year, the mortgaged premises were sold under the decree, by the master in chancery of that court, to Ogden, for $531.70, and a conveyance was made to him by the master. Ogden held the mortgaged premises, described in that suit, until the 26th day of July, 1851, when he sold and conveyed them to Edwin Townsend and others, for $10,600. On the first day of April, 1841, Ogden sold and conveyed to Scammon all the property included in the four first mortgages above mentioned, made

398        OGDEN, ETC., *v.* LARRABEE, ADM'R.        [Sept. T.,

Statement of the case.   Opinion of the Court.

by Spring, Norton, Pickering and Stewart, for $275, which, in effect, was a sale to Scammon of the half interest which he, Ogden, then held on account of the Spence estate, Scammon then being the equitable owner of the other undivided one-half interest in those mortgaged premises.   On the 3d day of April, 1841, Butler filed his claim against Spence's estate, in the county court, for the amount due upon the contract with Spence, and on the 2d day of December, 1841, it was allowed for $6,386.43; and after this claim was presented to the county court, and before it was allowed, on the 1st of September, 1841, Butler, by Ogden, as his attorney in fact, sold the residue of the land, which had been first sold to Spence, to Walter L. Newberry, for $550.

These are the facts, substantially, so far as it is necessary to present them here.

The questions arising in the case are set forth in the opinion.

Messrs. SCAMMON, MCCAGG & FULLER, for the appellant.

Mr. SIDNEY SMITH and Mr. H. R. SELDEN, for the appellee.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The object of the bill in this case is to charge appellant with certain funds that, it is alleged, he has in his hands and holds in trust for the estate of James Spence, deceased.   Relief was also sought against Charles Butler for an account of funds alleged to be in his hands, and also to have the allowance of a certain claim in his favor in the Cook county court against said estate set aside and cancelled, on the ground that Butler had put an end to the contract between himself and Spence before the allowance of the claim.

Several important questions arise on the record:

*First.*   Is the appellant, Ogden, chargeable, at the election of the *cestui que trust*, with the sum of $2000, the amount by him bid at the master's sale for the undivided one-half interest in

lots 7 and 8, or is he chargeable only with the sum of $275, the amount for which he afterwards sold the same?

*Second.* Is the appellant in like manner chargeable with the sum of $531.70, the amount he bid for lots 1 and 2 at the master's sale, or is he chargeable with the full amount of $10,600, for which he afterwards sold the same lots ?

*Third.* If an account shall be ordered against the appellant, shall he be charged with interest with annual rests, or only with simple interest?

*Fourth.* Should the *cestui que trust* be charged in the account, if one shall be taken, with the value of the tract of land conveyed to Skinner, and if so, at what time, and what fund ought to be charged with the payment of the purchase money ?

*Fifth.* Had Butler put an end to the contract between himself and Spence before the allowance of his claim against the estate, and, if so, could he afterwards lawfully obtain an allowance or judgment for the same in the county court?

We do not deem it necessary to consider the latter question indicated, at any considerable length. The evidence establishes the fact, beyond a doubt, that Butler had sold the remaining half of the parcel of land contracted to Spence, and had conveyed the same to Newberry, before the allowance of this claim in the county court against the estate of Spence. A party can not rescind an executory contract for the sale of land, and afterwards proceed to collect the purchase money. *Staley* v. *Murphy,* 47 Ill. 241.

Butler had previously conveyed the land, and thus put it out of his power to comply with his contract in case of compliance on the part of the vendee, and it would be most inequitable, after that, to allow him to collect the entire balance of the purchase money.

It is said there was no actual declaration of forfeiture of this contract on the part of Butler. It is true, there is no such expressed declaration to be found in the record, but no such expressed declaration is necessary. The act of the vendor, in

many instances, will be taken to amount to such a declaration, in law. *Chrisman* v. *Miller*, 21 Ill. 227 ; *Moore* v. *Smith*, 24 Ill. 512.

The sale of the property was a rescission of the contract, and that fact was itself the strongest possible declaration on the part of Butler that the contract was forfeited. Spence had not performed the contract, and Butler, by the sale of the premises to Newberry, placed it out of his power further to perform the contract on his part. There was, therefore, no contract existing at the time the judgment or order was obtained in the county court, and the obtaining of it was fraudulent in law, and the same ought to be set aside and cancelled. No doubt is entertained of the power of a court of chancery to annul and cancel a judgment at law, if it has been obtained by fraud. It has been so repeatedly held by courts of the highest authority. *Webster* v. *Reid*, 11 Howe, 437 ; *Wing* v. *Wing*, 9 Mod. 109 ; *Dobson* v. *Pearce*, 12 N. Y. 165.

The facts in this record present a proper case for the exercise of that power.

Our inquiry will be directed principally to the questions arising on the four propositions first above named.

On the facts contained in the record, what relation did the appellant sustain to Spence in his lifetime, and to his legal representatives after his death? Was it that of a trustee holding an estate to their use? If so, could he become a purchaser at his own sale, whether the sale was made by himself or under a judicial decree?

Spence purchased a tract of land from Butler, and held an agreement or bond, conditioned that Butler would make him a deed on the payment of the purchase money at the times and in the manner therein specified. The appellant executed the contract on the part of Butler as his attorney in fact. At the request of Spence, Butler conveyed one half of the parcel of land so contracted to him to Mark Skinner. It was understood between the parties, however, that Spence was to remain responsible to Butler for the entire purchase money. The

conveyance to Skinner seems to have been solely for the accommodation of Spence. Shortly after this conveyance to Skinner, Spence, to secure the amount due Butler, for the entire balance of the purchase money due on the parcel of land, assigned and delivered to appellant certain notes and mortgages, with " full power to settle, compromise or exchange the aforesaid mortgages and notes for other property or demands, taking part of the amount due in lieu of a larger part or the whole, as he shall think best in his judgment, and to cancel and discharge such mortgage from the records for such consideration as he may think proper," and to pay the amount so received to Butler in satisfaction of his indebtédness, and the remainder to Spence, or his heirs or assigns.

These facts would undoubtedly constitute the appellant the trustee of Spence to the extent of the funds in his hands, and would impose upon him the duty of the faithful application of the trust fund to the purpose intended, viz: the payment of the indebtedness to Butler. The appellant entered upon the discharge of the trust reposed in him, and must therefore be held liable to all the obligations resting on him in the discharge of such duties.

Under proceedings instituted for that purpose in the United States Court at Milwaukee, the mortgages thus assigned to appellant were foreclosed in the name of appellant, and at the master's sale under the decree rendered therein, he became the purchaser, on the 2d day of September, 1840, of lots 7 and 8, and on the 28th day of September, 1840, he became, in like manner, the purchaser of lots 1 and 2. Of the amount of these bids, there is no controversy. For lots 7 and 8, the bid was $2000, that is, for the interest of Spence held thus in the name of appellant, and for lots 1 and 2 the bid was $531.70. There is some controversy, however, as to whether appellant intended to make so large a bid on lots 7 and 8, and there is evidence that tends to show that the bid exceeded the value of the lots at the time. The bid was made for him by his authorized attorney at Milwaukee, and if the attorney exceeded his

26—57TH ILL.

402     OGDEN, ETC., *v.* LARRABEE, ADM'R.     [Sept. T.,

Opinion of the Court.

authority, the appellant should, in apt time, have repudiated the bid and had the sale set aside. In due time appellant received a deed for the lots under the bid thus made for him by his attorney, and he must, by that act, be held to have ratified the act of his attorney, and to have made the act of his attorney his own. Having received a deed with full knowledge of the amount bid, and that the bid was for more than the land was worth at the time, the appellant, by his act in receiving the deed, will be estopped on both questions, and must be held to his election to take the purchase at his bid. If he did not intend so to do, he ought to have made his election at the time, and had the sale vacated and set aside.

Soon after the appellant received the deed for lots 7 and 8, he conveyed the same to Scammon, who had an undivided interest in the same in his own right, for the nominal sum of $275.

We are unable to discover any fact in this case that will take it out of the general rule, that a trustee can not rightfully become a purchaser at his own sale, and hold to his own use. It matters not whether the sale is made by himself or under a decree of court. The rule applies alike in both cases. *Thorp* v. *McCullom*, 1 Gilm. 614; *Dennis* v. *McCagg*, 32 Ill. 429.

It is insisted that that clause in the assignments of the mortgages to the appellant, invested him with the most ample power to "settle, compromise, or otherwise sell, arrange or dispose" of the said notes and mortgages, and that the relation only of pledgor and pledgee existed between him and Spence, and therefore the appellant had the right to become the purchaser of these lots at the master's sale, and hold the same for the benefit of the pledgee, and under the same power to "settle and compromise," and under the power vested in him by the assignments, he could lawfully sell the property to whomsoever would buy, and would only be chargeable with the amount of the sale which, in the case of lots 7 and 8, would be only $275. We do not understand that these assignments created simply the relation of pledgee and pledgor, but if it

be conceded, we do not see that that would essentially change the relations of the appellant to Spence, or that the law in such a case would confer upon him any greater privileges or impose less liabilities in dealing with the pledge than the law imposes upon a trustee in dealing with a trust fund.

Under the power conferred by the assignments, the appellant could, no doubt, have received less than the amounts expressed on the face of the notes and mortgages, and would not have been chargeable for the loss in case he did so. The effect of the agreement was simply to relax the rule that a pledgee of securities could not, without express consent of the pledgor, take less than the amount expressed on the face without rendering himself liable to the pledgor for the amount so deducted.

But in the view we have of this case, that is not the exact question involved. The power conferred no new authority on the appellant to become a purchaser at his own sale, nor was it ever intended or contemplated by the parties to the assignments that he should do so. If he chose thus to bar the equity of redemption of the original mortgagors in the premises by taking the title to himself under the master's sale, he would still hold the property, as he did the original securities, in trust for Spence, to be applied for the purpose originally intended. By no fair construction of the assignments, was the appellant authorized to become a purchaser at his own sale, and to hold for his own use, and to dispose of the same to whomsoever would buy, without the consent of the *cestui que trust*.

We do not mean to be understood that the sale itself is invalid. It was only voidable, at the election of the *cestui que trust*. It was, doubtless, effectual to bar the equity of redemption of the original mortgagors, and valid and binding on all except the *cestui que trust*.

For the purpose of foreclosing and barring the equity of redemption of the original mortgagors, the appellant might be authorized to buy at the master's sale, and after he had bid off the property and thus foreclosed the rights of the original

mortgagors, and all claiming under them, he would still hold it as he held the notes and mortgages as trustee for Spence, as security for his indebtedness to Butler. It was simply one step in the execution of the power conferred upon him, and the character of the fund was in nowise changed, nor his relations to it. It was still a trust fund, for the faithful application of which he was still liable to the *cestui que trust.* This doctrine was fully recognized in the cases of *Slee* v. *The Manhattan Company*, 1 Paige, Chy. 48, and *Hoyt* v. *Martense,* 16 N. Y. 231. In *Hoyt* v. *Martense*, it was held that the equitable rule which forbids a trustee or a person acting in a fiduciary capacity from speculating out of the subject of the trust, applies as well after the foreclosure as before.

In the case of *Slee* v. *The Manhattan Company,* the court, in speaking of the effect of a sale, either under the statute or under a decree, where the mortgagees of the debt secured by the mortgage, become themselves the purchasers, say, " in that case they only purchase the equity of redemption which existed in the original mortgagors, and the equity of redemption of the assignor still continues to attach itself to the legal estate which remained unchanged in the purchaser, except by this discharge of the equity of redemption of the original mortgagors, which, by the foreclosure, became merged in the legal estate. "

If the appellant shall be regarded as the trustee of this estate, and we can not regard him in any other light, in view of the evidence and the relation of the parties, what are the rights of the *cestui que trust* in such cases? Can the *cestui que trust,* in this instance, elect to hold the appellant to the bid of $2000, or will the law require him to receive only the amount for which the lots sold at the subsequent sale, viz: the sum of $275.

It is insisted by the counsel, that the ordinary rule by which to charge the appellant for this property would be its full value at the time he sold it, and inasmuch as the proof shows that the property was sold to Scammon for its full value, that that

is the highest amount with which the appellant can properly be charged for lots 7 and 8.

We have not been able to find any case, nor have we been referred to any, that fully sustains this view of the law. We do not understand that the terms of the assignment itself aid the view presented by the counsel. The appellant, in the light of the evidence, can only be regarded as holding the property in trust, and as having purchased it at his own sale. It is wholly immaterial whether the sale was under the power vested in him by the terms of the assignment, or under a decree of court, friendly or hostile to the interests of the *cestui que trust.*

The general rule is, that the *cestui que trust* may have his election to hold the trustee to the amount of his bid, or may have the property re-sold; and if at the re-sale the bid is advanced, the *cestui que trust* will be entitled to the excess over the bid of the trustee. But if the bid is not advanced, the sale will be confirmed, and the trustee required to account for the amount of his bid. This rule has been fully recognized by this court in *Thorp* v. *McCullom*, 1 Gilm. 614, and is fully supported by authority. *Ex parte Reynolds*, 5 Ves. 707; *Ex parte Hughes*, 6 Ves. 617.

The case of *Davoue* v. *Fanning et al.* 2 Johns. 251, is an elaborate review of the English cases on this question, and fully establishes the rule that the beneficiary in all such cases has his election either to acquiesce in the sale and have it affirmed, or to have it set aside and a re-sale ordered, and it makes no difference in the application of the rule whether the sale was at public auction, *bona fide*, and for a fair price. Mr. STORY says that "in all cases where a purchase has been made by a trustee on his own account, of the estate of his *cestui que trust*, although sold at public auction, it is in the option of the *cestui que trust* to set aside the sale, whether *bona fide* made or not." Eq. Jur. 2, 322.

The rule has been nowhere stated with more clearness and precision than by Chancellor KENT, in his Commentaries, where

he says : " it may be here observed, as a general rule applicable
to sales, that when a trustee of any description, or a person
acting as agent for others, sells a trust estate and becomes him-
self interested, either directly or indirectly, in the purchase,
the *cestui que trust* is entitled, as of course, in his election, to
acquiesce in the sale, or to have the property re-exposed to sale
under the direction of the court, and to be put up at the price
bid by the trustee, and it makes no difference in the application
of the rule that the sale was at public auction, *bona fide*, and
for a fair price. A person can not act as agent for another and
become himself the buyer. He can not be both buyer and
seller at the same time, or connect his own interest in his deal-
ings as agent or trustee for another. It is incompatible with
the fiduciary relation." 4 Kent, sec. 438.

The rule seems to be uniform and inflexible, that where a
trustee of any kind buys property, directly or indirectly, of
which he is the trustee, the *cestui que trust* may, at his option,
without reference to the fact whether it was to his interest or
not, and without proof that he is damnified, or even inquiring
into that question, have the sale set aside, and have the prop-
erty re-exposed to sale, or he may elect to have the sale affirmed
at the bid of the purchaser, or, where the property has been
sold by the trustee to a third party, to have the value of the
property, or the amount realized by the sale.

In many instances this rule may be found to work very
serious hardships, but it has never for that reason been relaxed
by the courts. It has been found by many year's experience,
that the temptation to the trustee to take advantage of his
peculiar position and misapply the trust fund to his own gain
and profit, is so great that it is necessary to enforce the rigid
principles of the law in every case. The rule has a wider and
broader meaning. It may be said to have its foundation in a
sound public policy, to secure the enforcement of all fiduciary
obligations in which the public have a varied and ever increas-
ing interest. In the multiplied and complicated transactions of
the present day, there seem to be still stronger reasons for

enforcing these just principles of the law than in former times. Fortunes were only amassed in those earlier days after long years of patient labor; indeed, only a few were successful. In the swift desire that now prevails, and by the opportunities afforded by the rapidly changing values of real estate, stocks and articles of merchandise, fortunes are realized in a comparatively short period. It is no time, therefore, to relax those wise and salutary rules that have been established by the judicial wisdom of the past to govern the relations between the trustee and the *cestui que trust*, but these facts, constantly occurring, which can not escape our common observation, constitute strong and controlling reasons for the most rigid enforcement of them.

It is insisted that the court erred in allowing the *cestui que trust* to elect to hold the appellant to the bid on lots 7 and 8, and to charge him with the amount realized on the sale to Townsend of lots 1 and 2. It is urged that but one rule of accountability should be applied to them, in which the appellant would be charged with $2000 for the first bid, and $531.70 for the second; or, if the *cestui que trust* elects to take the amount realized at either subsequent sale, he should be required to take both, in which event he would be compelled to receive $275 for lots 7 and 8, and $10,600 for lots 1 and 2.

The cases of *Jennison* v. *Hapgood*, 10 Pick. 77, and *Hapwood* v. *Jennison*, 2 Ver. 294, do, to a certain extent, sustain the rule contended for by the counsel, that the courts will require parties who elect to consider sales void, and have the property again brought to sale at a price at which it was bid off by the trustee, to have it put up at the re-sale, in lots or *en masse*, accordingly as it was bid off by the trustee. We think those cases state the law correctly on that question. The authorities all seem to agree that the right of election on the part of the *cestui que trust* to hold the trustee bound to carry out his bid or to relinquish it for the benefit of the trust, is confined to bids as they took place, whether in one lot or several, even at the same sale. *Ex parte Lacey*, 6 Ves. 625; *Ex parte James*, 8 Ves. 351.

In *King* v. *Talbot,* 40 N. Y. 77, the court say, there is " no reason for saying that where the trustee has divided the fund into parts and made separate investments, the *cestui que trust* is not at liberty, on equitable as well as legal grounds, to approve and adopt such as he thinks it for his interest to adopt. " In this instance the bids were separate and distinct and distant and apart, and for separate pieces of property, and no reason or authority to the contrary is perceived why the party should not be permitted to affirm the sale in one instance and hold the trustee to his bid, and disaffirm in the other case, and have an account taken of the profits arising from a subsequent sale. We think the court ruled correctly and in accordance with the adjudged cases on that question, and is fully sustained on principle.

It is urged that the court erred in allowing annual rests in computing interest on the account ordered to be taken against the appellant.

The rules of law applicable to trustees who misapply the trust estate without notice to the *cestui que trust*, often seem harsh and severe in their application to particular cases. They are intended, however, to impose a degree of punishment upon the trustee for the wrongful act. Such rules have their foundation upon the necessity that has been found by experience to exist to compel the performance of duties which the fiduciary relations impose. The courts, by way of making full compensation, will sometimes compel the trustee to purchase other estate of equal value, or they will permit the *cestui que trust,* at his option, to exact the proceeds of the same, with interest, and even in some instances he has been permitted to demand the present estimated value of the estate, in case of a resale to a third party. The latter rule, where the price and value of real estate advances with such rapidity as in this western country, would be deemed a very harsh, and, in many instances, an inequitable rule, and the party is seldom, if ever, permitted to elect to have that rule enforced. If that rule should be enforced in this case, it would be oppressive in its

operation, for the evidence shows that the land sold by the appellant has greatly increased in value. It would be inequitable, therefore, to permit a party to elect under that rule under circumstances like those presented in this case, even if it be conceded that there has been a wilful misapplication of the trust fund.

If the trustee had kept an exact account, the equitable rule is, that he should account to the *cestui que trust* for all he has realized by the use of the fund. It is said "that the true rule in equity, in such cases, is to take care that the gain should go to the *cestui que trust.*" 2 Story Eq. Jur. sec. 1277.

But if the trustee has not kept such an account, the law will still require him to make adequate compensation, and in order to do this, will at least presume he has made annual interest on the fund used, and will therefore, to effectuate this purpose, and to do justice, charge him with annual, and sometimes with semi-annual, rests, in the computation of interest. The rule seems to be, that in all cases where the trustee has used the trust fund, and the court can see from the evidence that the trustee has realized large gains and profits to himself, and has failed to keep any exact account of the same, or has refused to render an account to the beneficiary, the law will require him, in order that complete justice may be done, to account for the original fund so used, with interest computed with annual rests. No better mode has yet been devised to effectuate and promote the ends of justice. This rule may be said to be the settled doctrine of this country and of England, on this question.

In *Schieffelin* v. *Stewart et al.* 1 Johns. Chy. 620, the chancellor said: "It is certain that the allowance of compound interest is often essential to carry into complete effect the principle of the court, that no profit, gain nor advantage shall be derived by the trustee from the use of the trust fund. All the gain must go to the *cestui que trust.* This is the true equity doctrine. It secures fidelity and removes temptation, and it is the ground of this allowance of annual rests in the taking

of the account where the executor has used the property and does not disclose the proceeds."

In *Barney* v. *Saunders*, 16 How. 539, the court said: "When a trust to invest has been grossly and wilfully neglected, where the funds have been used by the trustees in their own business, or profits made of which they give no account, interest is compounded as a punishment or as a measure of damage,' for undisclosed profits, and in place of them."

In *Raphael* v. *Boehn*, 10 Ves. 92, the chancellor allowed semi-annual rests, but it was under peculiar circumstances, where there were large sums to be invested, and perhaps the case does not establish a general rule on that question. The case was again before the court upon a rehearing, and the doctrine advanced in the former opinion was affirmed. It is, perhaps, true, that there are some exceptions to the general rule, that in taking the account against the trustee, he will be charged with compound interest. The application of the rule may be said to depend somewhat upon the circumstances of each case, as in the case of *Raphael* v. *Boehn, supra.*

In *Raynor* v. *Bryson*, 29 Md. 473, it was held that compound interest should never be allowed, except in cases where there had been intentional misconduct or gross negligence on the part of the party withholding the money.

If the doctrine in that case is to be applied to the present one, the evidence brings it clearly within the rule there stated. There is evidence in this record tending to show gross negligence on the part of the appellant in these transactions, in the application of the trust fund. By his own testimony, he certainly knew, at the time he made the sale to Townsend, that he did not own the property in his own right; that he held it in trust for the legal representatives of Spence, for he attempted to procure, and perhaps did procure, a release from the heirs. When the sale was effected after the release was procured, instead of applying the proceeds to the benefit of the estate of Spence, as it was his plain duty to do, the appellant applied

the proceeds to the credit of what is called "the Hunter purchase," in which he was himself personally interested. The appellant had no right to sell lots 1 and 2 after he discovered that he held them in trust for the estate of Spence, and he ought then to have made a fair and full disclosure of the whole facts to the legal representatives. Instead of doing that, he procured the release from the heirs, upon what representations we know not, and placed the funds realized from the sale to the credit of the land company, where, doubtless, large profits were realized, of which he offers no explanation or gives no account, in his answer or otherwise: It further appears that after the contract between Butler and Spence had been annulled and rescinded by the conveyance of the land to Newberry, the appellant, with full knowledge of all the facts, received from the administrator a dividend of $297.80, on the claim allowed for the purchase money. It is difficult to explain all these transactions consistently with that fair and equitable dealing which the law requires between trustee and *cestui que trust*. We must, therefore, conclude that appellant has wilfully misapplied the trust fund, at least so far as the proceeds of lots 1 and 2 are concerned, and under either rule of law suggested, he must be charged in the account to be taken with interest at annual rests. The appellant has failed to render any account of the profits realized out of the use of the trust fund, and has even denied his liability to be called to an account. The facts in this case present a clear case for the application of the strict principles of the law. The evidence discloses that the investment of these funds by the appellant must have been very profitable, and he must have realized large profits therefrom, of which he gives no account, and it is doubtful whether the rule which requires him to account for the original fund, with interest computed with annual rests, will do complete justice between the parties.

There is still another question involved in the case. It appears that Butler, at the request of Spence, conveyed to Skinner one half of the tract of land contracted to him. The

consideration expressed in the deed is $2250, about one-half of the balance of the purchase money due Butler on the original purchase. What the real consideration was, the evidence does not show, and it is, perhaps, immaterial. It is certain that Butler parted with his interest in the land for the benefit of Spence. We can perceive no reason why Spence or the estate should not be charged with a proportion of the purchase money of the land conveyed to Skinner, and it seems to us that it would be most inequitable to allow the legal representatives of the estate to retain the same without making compensation therefor. The appellee comes into a court of equity and asks to have the equities between the parties adjusted, and he must, therefore, himself, do that which is just and equitable. The sale of the land to Newberry, while it put an end to the contract, so far as it remained to be executed, did not and could not affect that part that had already been executed. Spence had received the benefit of the conveyance to Skinner and Butler; had parted with his interest in that portion of the property. The parties, by their mutual agreement, severed the contract, and the vendee received a deed to his grantee for one half the land. To that extent the contract was executed, and Butler was, in law and in equity, entitled to compensation for that portion of the property. If Spence should not be required to pay for the land conveyed to Skinner, it is manifest that he would get one half the land he purchased, for nothing, simply because he failed to pay for the other half. We do not see how the equities between the parties can be adjusted upon any equitable principle, unless the estate should be charged with the just proportion of the purchase money for the one half the property thus conveyed to Skinner at the request of Spence, and for which he received the benefit in his lifetime.

The decree of the court below proceeds upon the correct principle, and we are entirely satisfied with the decree, except in this one particular. The court adopted the true rule for stating the account between the parties, and it is approved by

this court in every particular except the one indicated.  We are of opinion, however, that the court ought to have directed the master, in stating the account, to charge the estate with one half the original purchase money for the land contracted to Spence on account of the one half conveyed to Skinner.  For this error alone this decree must be reversed and the cause remanded.

The court will direct the master to charge the estate with one half the amount of the purchase money of the tract of land contracted to Spence by Butler, and to apply, in payment thereof, 1st, the $400 cash received at the time the contract was made; 2nd, the $500 received from the sale of the 160 acres of land; 3d, the amount received on the Raynor note; and, fourth, so much of the $2000 bid for lots 7 and 8 as shall be necessary to make up the amount of one half of the original purchase money, and will decree, in all respects, as in its former decree.

*Decree reversed.*

Mr. JUSTICE SHELDON dissents from so much of the foregoing decision as charges Ogden with the amount of his bid for lots 7 and 8 on the foreclosure sale of them, being of opinion that, under the circumstances of this case, he should be charged only with the proceeds of the sale of the lots by him, and interest thereon, and not with the amount of said bid.

At a subsequent term, on the petition of the appellant, a rehearing was granted, whereupon the following additional opinion was announced :

Per CURIAM :  On the petition of the appellant, a rehearing has been allowed in this case on a single point, viz : that the payments made upon his contract by James Spence ought not to be wholly applied on account of the one half of the land conveyed to Mark Skinner, but ought to be divided so as to

414     OGDEN, ETC., *v.* LARRABEE, ADM'R.     [Sept. T.,

Additional opinion of the Court.

apply one half of them on that, and the other half on that part of the land which was retained by Butler after forfeiture of the contract.

This point was not made or argued on the original hearing, and was not considered by the court.

The contract between Butler and Spence provided, that in case default of payment of principal or interest for 60 days after the same became due, Butler, at his option, should have the right to declare the contract forfeited, and that all payments made on the contract should be absolutely and forever forfeited to him. We held that, under this provision of the contract, Butler, by the deed to Newberry, made on the first day of September, 1841, and acquiesced in by the heirs of Spence, did put an end to the contract, and declared the same for-forfeited.

In view of the fact that the payments that were made by Spence, in his lifetime, were made on the whole lot, we are of opinion that the directions given in the original opinion for computing the amount due from appellant should be modified. The directions there given are hereby so modified that the Superior Court will direct the master in making the computation to charge the appellant with one half the payments made by Spence in his lifetime on the contract, and to regard the other half of such payments as lost to the estate, according to the terms of the agreement.

The decree is reversed, and the cause remanded for further proceedings consistent with the former opinion as now modified.

*Decree reversed.*